**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 20-cv-23013-BLOOM/Louis**

CHLOE TSAKIRIS ALSTON,

      Plaintiff,

v.

WWW.CALCULATOR.COM;
UNKNOWN REGISTRANT a/k/a
RUTH YAKOBZON; STANDS4 LTD;
and GODADDY.COM, LLC,

      Defendants.

_____/

**ORDER**

      **THIS CAUSE** is before the Court upon Defendant Stands4 LLC a/k/a Stands4 LTD's ("Stands4") Expedited Motion to Dissolve Temporary Restraining Order, ECF No. [10] ("Motion"), filed on July 28, 2020. Plaintiff Chloe Tsakiris Alston ("Plaintiff") filed a response in opposition, ECF No. [18] ("Response"), on July 30, 2020, and Stands4 filed its reply, ECF No. [19] ("Reply"), later that same day. On July 31, 2020, the Court held a hearing on the Motion, at which counsel for Stands4 and Plaintiff argued their respective positions. The Court has carefully considered the Motion, all opposing and supporting submissions, the arguments presented at the hearing, the record in this case, and the applicable law, and is otherwise fully advised. For the reasons set forth below, the Motion is denied.

## I.  BACKGROUND

      Plaintiff initiated the instant action against Defendants www.calculator.com, Unknown Registrant a/k/a Ruth Yakobzon, Stands4, and GoDaddy.com, LLC (collectively, "Defendants") on July 21, 2020, alleging claims under the Anticybersquatting Consumer Protection Act, 15

U.S.C. § 1125(d) ("ACPA"), the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"), the Lanham Act, 15 U.S.C. §§ 1114, 1125, Unjust Enrichment, and Trespass to Chattels, Computer Trespass, and Conversion. *See generally* ECF No. [1] ("Complaint"). Plaintiff's claims stem from the alleged theft, sale, and use of Plaintiff's internet domain name, www.calculator.com ("Domain Name"), and corresponding trademark. *Id.*

### A. Underlying Facts

In January 1996, Plaintiff's father registered the Domain Name "www.calculator.com" in Plaintiff's name. *Id.* ¶ 16. Since registering this Domain Name, Plaintiff and her father have been continuously developing and operating the website under the trademark/service mark "calculator.com" to market its services throughout the world. *Id.* ¶ 17. Based on this historical use, Plaintiff owns the trademark/service mark "calculator.com." *Id.* Plaintiff and her father operate the calculator.com business by providing various online calculators to the public free of charge, thus generating advertising revenue and increasing the Domain Name's value based upon the number of website visitors. *Id.* ¶ 18. Over the course of the past twenty-four years, Plaintiff and her father have expended substantial amounts of time and money to develop, market, and promote the website's services and to build the calculator.com brand through the use of their mark. *Id.* ¶ 19.

As a result of these efforts, the calculator.com trademark is distinctive and has become well known and famous in the geographic regions in which Plaintiff does business. *Id.* ¶ 20. Likewise, Plaintiff's trademark has acquired name recognition and invaluable customer goodwill, and has ultimately achieved a secondary meaning such that the public throughout the regions in which calculator.com does business associates this mark with Plaintiff's reliable online calculator services. *Id.* Plaintiff's website attracts approximately 166,000 daily active users on a monthly basis from all over the world who utilize the calculator services offered, and the website is essential

to the markets, individuals, and clients from all around the world that rely on the calculator services offered because it is the sole location where Plaintiff offers these services. *Id.* ¶¶ 21-22. The Complaint further alleges:

23. Network Solutions, LLC is a registrar, that is, an organization that is accredited to sell domain names that are managed by Verisign, the top-level domain name registry of .com domain names.

24. Network Solutions, LLC is the registrar where the Domain Name was initially registered by Plaintiff in January of 1996.

25. GoDaddy.com, LLC is the registrar where the Domain Name is currently registered, and is named as a nominal defendant herein.

26. Plaintiff [] utilized the website that was accessible through the Domain Name to operate a business providing internet users with various online calculators. The Domain Name has generated income by way of advertising revenue exclusively for Plaintiff [] and her family.

. . . .

28. On or about November of 2018, Plaintiff discovered that her domain name was being transferred without Plaintiff's authorization to a different named owner, Defendant Unknown Registrant, and auctioned off on sedo.com—an online marketplace and trade platform used to auction and sell Internet domain names.

29. Plaintiff learned of the theft of the Domain Name when a person named Richard Kershaw, the winner of the online auction, contacted her and her father, Nicholas Alston, to determine whether the sale was legitimate. Plaintiff informed Richard Kershaw that the sale was fraudulent, then checked with Network Solutions and discovered that the calculator.com Domain Name was being transferred out of Plaintiff's account.

30. Richard Kershaw forwarded the PDF Payment Request that he received from the Defendant Unknown Registrant with respect to the sedo.com auction, in which Defendant Unknown Registrant utilized the name "Ruth Yakobzon," with an address of "1 Cheryl Ln, 01821 Billerica United States." Richard Kershaw indicated that he was suspicious of the purchase because the name of the seller on the auction website (Ruth Yakobzon) did not match the Plaintiff's name, which was listed on the public WHOIS domain name registration information database. Additionally, the owner of the United States property address did not match the name of the seller.

31. Plaintiff and her father immediately contacted Network Solutions to stop the transfer and restore the account contact details to Chloe's real email address.

32. During phone calls with Network Solutions staff, Plaintiff learned that Defendant Unknown Registrant fraudulently induced Network Solutions to change the contact details of the Domain Name's owner to that of Unknown Registrant's by creating and using an email account that impersonates the Plaintiff, Chloe Alston (to wit: chloe.alstonnet@gmail.com) and sending Network Solutions a fake Connecticut Driver's License and fake utility bill as proof of identification. Network Solutions accepted the fraudulent documents and changed the ownership

information of the Domain Name, including the email address associated with the account, to that of Defendant Unknown Registrant. Defendant Unknown Registrant was therefore able to take control of the account, list the Domain Name for sale and attempt to transfer the Domain Name out of Plaintiff's account.

33. Network Solutions stopped the transfer, but unbeknownst to Plaintiff, failed to restore the correct contact information. As a result, Unknown Registrant was able to transfer the Domain Name to Defendant Unknown Registrant's account with the GoDaddy.com, LLC registrar in April of 2020, and thereafter, transfer the Domain Name to Defendant Stands4 LTD's account with the registrar GoDaddy.com, LLC on June 19, 2020.

34. The Plaintiff's account was hacked by Defendant Unknown Registrant, who fraudulently transferred the domain name www.calculator.com to Defendant Unknown Registrant's own account with Defendant GoDaddy.com, LLC and based on information and belief, has sold the Domain Name to Defendant Stands4 LTD in the hope of extracting a quick payoff and profit from its theft of the Domain Name from Plaintiff, the rightful owner.

35. The Defendant Unknown Registrant's transfer of the domain name www.calculator.com was in bad faith, and for the singular purpose of seeking to profit from its theft.

36. Similarly, Defendant Stands4 LTD acquired ownership of the Domain Name in bad faith, without conducting due diligence to determine the identity of the rightful owner of the Domain Name, and intends to profit from its ownership and operation of the website located at the Domain Name. As indicated above, a simple search of the online Whois domain name database would have revealed that Plaintiff was the true owner of the website.

37. The Domain Name is highly valuable and its loss has deprived the Plaintiff of the income revenue generated by the business as well as depriving Plaintiff of its valuable position on the search results, deteriorating its search engine rankings. To date, Plaintiff has lost approximately $10,000 per month in gross advertising revenues as a result of the domain name hijacking, and the search engine rankings [have] now dropped from number one to number six, which equates to a roughly 60% decrease in monthly revenues (assuming ownership of the Domain Name is restored to Plaintiff).

38. Additionally, Plaintiff has been deprived of the value of the Domain Name itself, which is worth approximately $1,237,000 according to estibot.com, an online domain name appraisal service.

*Id.* ¶¶ 23-38 (citations omitted) (footnote omitted).

**B. Procedural History**

On July 22, 2020, Plaintiff filed an *Ex Parte* Application for Entry of Temporary Restraining Order and Preliminary Injunction, ECF No. [5] ("TRO Motion"), requesting that this Court enter a temporary restraining order compelling Defendants to immediately transfer the

Domain Name back to Plaintiff pending the resolution of this suit, along with corresponding documents in support, ECF No. [6]. On July 27, 2020, upon review of the TRO Motion and accompanying exhibits, the Court granted the requested injunctive relief and scheduled a preliminary injunction hearing to be held on August 7, 2020, at 1:30 p.m. ECF No. [8] ("TRO").

The next day, Stands4 filed the instant Motion to dissolve the TRO, arguing that this Court lacks personal jurisdiction over Stands4 and that, on the merits, Plaintiff failed to establish the four substantive requirements for injunctive relief. ECF No. [10]. The Court ordered Plaintiff to file an expedited response, which Plaintiff timely filed on July 30, 2020. ECF No. [18]. Stands4 subsequently filed its Reply on the same day. ECF No. [19]. On July 31, 2020, the Court held a hearing on Stands4's Motion. ECF No. [16]. Counsel for Stands4 and Plaintiff were present, and each party argued their respective positions, particularly as they related to the issue of this Court's ability to exercise personal jurisdiction over Stands4. ECF No. [20].

## II. LEGAL STANDARD

### A. Personal Jurisdiction

The Court of Appeals for the Eleventh Circuit has explained that "the issue of whether personal jurisdiction is present is a question of law," and "[a]n *in personam* judgment entered without personal jurisdiction over a defendant is void as to that defendant." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1217 (11th Cir. 2009) (citing *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996)) (quoting *Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 924 (11th Cir. 2007)).

"A plaintiff seeking to establish personal jurisdiction over a nonresident defendant 'bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction.'" *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013)

(quoting *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009)). "Once the plaintiff pleads sufficient material facts to form a basis for *in personam* jurisdiction, the burden shifts to the defendant to challenge plaintiff's allegations by affidavits or other pleadings." *Carmouche v. Carnival Corp.*, 36 F. Supp. 3d 1335, 1388 (S.D. Fla. 2014), *aff'd sub nom. Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201 (11th Cir. 2015). A defendant challenging personal jurisdiction must present evidence to counter the plaintiff's allegations. *Internet Sols. Corp. v. Marshall*, 557 F.3d 1293, 1295 (11th Cir. 2009).

"Where . . . the Defendant submits affidavit(s) to the contrary, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002); *see also Internet Sols. Corp.*, 557 F.3d at 1295; *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855 (11th Cir. 1990). If the defendant makes a sufficient showing of the inapplicability of the long-arm statute, "the plaintiff is required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint." *Polskie Linie Oceaniczne v. Seasafe Transp. A/S*, 795 F.2d 968, 972 (11th Cir. 1986). Conclusory statements, "although presented in the form of factual declarations, are in substance legal conclusions that do not trigger a duty for Plaintiffs to respond with evidence of their own supporting jurisdiction." *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1215 (11th Cir. 1999).

In addressing whether personal jurisdiction over a non-resident defendant exists, "[t]he district court must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits." *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990) (citing *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988)). Moreover, "where the

plaintiff's complaint and the defendant's affidavits conflict, the district court must construe all reasonable inferences in favor of the plaintiff." *Id.*

### B. Injunctive Relief

Federal Rule of Civil Procedure 65(b) governs the issuance of temporary restraining orders:

(b) **Temporary Restraining Order.**
(1) **Issuing Without Notice.** The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.
. . . .
(4) **Motion to Dissolve.** On 2 days' notice to the party who obtained the order without notice—or on shorter notice set by the court—the adverse party may appear and move to dissolve or modify the order. The court must then hear and decide the motion as promptly as justice requires.

Fed. R. Civ. P. 65(b)(1), (4).

A court may grant injunctive relief "to protect the plaintiff from irreparable injury and to preserve the district court's power to render a meaningful decision after a trial on the merits." *Canal Auth. of the State of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974);[1] *see also Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974))) ("*NE Fla. CAGC of Am.*"). Such relief "is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Callaway*, 489 F.2d at 573.

---

[1] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the Court of Appeals for the Fifth Circuit decided prior to October 1, 1981.

To obtain injunctive relief, a movant must satisfy four requirements: (1) "a substantial likelihood of success on the merits," (2) "that the preliminary injunction is necessary to prevent irreparable injury," (3) "that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant," and (4) "that the preliminary injunction would not be averse to the public interest." *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1271 (11th Cir. 2014) (citing *Parker v. State Bd. of Pardons & Paroles*, 275 F.3d 1032, 1034-35 (11th Cir. 2001)); *see also Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225-26 (11th Cir. 2005); *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).

"[P]roof of a substantial likelihood of success on the merits is an indispensable prerequisite to a preliminary injunction." *Schiavo ex rel. Schindler*, 403 F.3d at 1240 (Wilson, J., dissenting) (citing *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989)). Yet, this prerequisite requires a movant to demonstrate a "substantial likelihood," not a substantial certainty. *Id.* at 1240-41. Thus, "the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the [injunction]." *Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir. 1981); *see also Gonzalez v. Reno*, No. 00-11424-D, 2000 WL 381901, at *1 (11th Cir. Apr. 19, 2000); *United States v. Hamilton*, 963 F.2d 322, 323 (11th Cir. 1992); *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986). A court's review "require[s] a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief." *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000).

## III.  DISCUSSION

In the instant Motion, Stands4 raises two arguments to support its request that the TRO be dissolved in this case. First, Stands4 argues that this Court lacks personal jurisdiction over it because doing so would be inconsistent with Due Process. Second, Stands4 contends that the TRO should be dissolved because Plaintiff has failed to satisfy the requirements for injunctive relief here. In her Response, Plaintiff defends both the existence of personal jurisdiction over Stands4 and the validity of the TRO that is currently in place. This Court will individually address each argument below.

### A.  Personal Jurisdiction

As an initial matter, the Court must address the issue of personal jurisdiction over Stands4. *See Oldfield*, 558 F.3d at 1217 ("[a]n *in personam* judgment entered without personal jurisdiction over a defendant is void as to that defendant" (quoting *Sloss Indus. Corp.*, 488 F.3d at 924)). Courts consider "two questions in resolving personal jurisdiction: (1) whether personal jurisdiction exists over the nonresident defendant [] under Florida's long-arm statute, and (2) if so, whether that exercise of jurisdiction would violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1350 (citing *Mut. Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1319 (11th Cir. 2004)). "Both parts [of the test] must be satisfied for a court to exercise personal jurisdiction over a non-resident." *Am. Fin. Trading Corp. v. Bauer*, 828 So. 2d 1071, 1074 (Fla. 4th DCA 2002).

"The reach of Florida's long-arm statute 'is a question of Florida law,' and this Court is required to apply the statute 'as would the Florida Supreme Court.'" *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1352 (quoting *United Techs. Corp.*, 556 F.3d at 1274). Courts "are also bound to adhere to the interpretations of Florida's long-arm statute offered by Florida's District Courts of

Appeal absent some indication that the Florida Supreme Court would hold otherwise." *Id.* Moreover, "Florida's long-arm statute is to be strictly construed." *Sculptchair, Inc.*, 94 F.3d at 627.

Florida's long-arm statute, Fla. Stat. § 48.193, "addresses both specific and general jurisdiction." *Caiazzo v. Am. Royal Arts Corp.*, 73 So. 3d 245, 250 (Fla. 4th DCA 2011). Section 48.193 states, in relevant part, that:

> (1)(a) A person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from any of the following acts:
>
> . . . .
>
> > 1. Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
>
> . . . .
>
> (2) A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.

Fla. Stat. §§ 48.193(1)(a)1., (2).

Thus, under Florida's long-arm statute, a non-resident defendant can be subject to personal jurisdiction in Florida in two ways: (1) "a defendant [can be subject] to *specific* personal jurisdiction—that is, jurisdiction over suits that arise out of or relate to a defendant's contacts with Florida," and (2) "Florida courts may exercise *general* personal jurisdiction—that is, jurisdiction over any claims against a defendant, whether or not they involve the defendant's activities in Florida—if the defendant engages in 'substantial and not isolated activity' in Florida." *Carmouche*, 789 F.3d at 1203-04 (citing Fla. Stat. §§ 48.193(1)(a), (2)); *see also Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000); *Sculptchair, Inc.*, 94 F.3d at 626.

In her Response, Plaintiff argues that general and specific personal jurisdiction both exist.[2] Thus, the Court will address each form of personal jurisdiction below.

### 1. General Personal Jurisdiction

"General personal jurisdiction is based on a defendant's substantial activity in Florida without regard to where the cause of action arose." *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1352 (citing *Oldfield*, 558 F.3d at 1220 n.27). Pursuant to Florida's general jurisdiction, a non-resident defendant may be haled into a Florida court if it is "engaged in substantial and not isolated activity within [the] state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity." Fla. Stat. § 48.193(2). "A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations," without offending due process "when [the foreign corporations'] affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction and require a showing of continuous and systematic general business contacts between the defendant and the forum state." *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1292 (11th Cir. 2000) (citing *Borg-Warner Acceptance Corp. v. Lovett & Tharpe, Inc.*, 786

---

[2] Plaintiff further contends that this Court can exercise personal jurisdiction over Stands4 pursuant to Federal Rule of Civil Procedure 4(k)(2), based on Stands4's aggregate nationwide contacts. ECF No. [18] at 8-9. As Stands4 rightfully notes, however, the Complaint does not assert Rule 4(k)(2) as a basis for personal jurisdiction, nor does it contain any allegations regarding Stands4's additional nationwide contacts that would support this basis for personal jurisdiction. Thus, the Court rejects Plaintiff's argument for personal jurisdiction over Stands4 on this basis without further discussion. *See Louis Vuitton Malletier, S.A.*, 736 F.3d at 1350 ("A plaintiff seeking to establish personal jurisdiction over a nonresident defendant 'bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction.'" (quoting *United Techs. Corp.*, 556 F.3d at 1274)).

F.2d 1055, 1057 (11th Cir. 1996)). Thus, "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). "A corporation's place of incorporation and its principal place of business are 'paradigm all-purpose forums.'" *Carmouche*, 789 F.3d at 1204 (quoting *Daimler AG*, 571 U.S. at 137). Furthermore, "'a corporation's operations in a forum other than its formal place of incorporation or principal place of business' will be 'so substantial and of such a nature as to render the corporation at home in that State' only in 'exceptional' cases." *Id.* (quoting *Daimler AG*, 571 U.S. at 139 n.19).

The Eleventh Circuit has further explained the contacts necessary to render a corporation "at home" in the forum state. *See Waite v. AII Acquisition Corp.*, 901 F.3d 1307 (11th Cir. 2018). When a defendant's state of incorporation and principal place of business are not in the forum state, a court's task is to decide whether the case is one of the exceptional cases in which general jurisdiction is still proper. *Id.* at 1317-18. "To make this decision, [a court] must consider whether 'the corporation's activities in the forum closely approximate the activities that ordinarily characterize a corporation's place of incorporation or principal place of business.'" *Id.* at 1318 (quoting *Carmouche*, 789 F.3d at 1205).

Here, although Plaintiff argues the existence of general personal jurisdiction in her Response, ECF No. [18] at 5-6, the Complaint is entirely devoid of any allegations that would support the conclusion that Stands4 engages in such substantial not isolated activity in Florida to render it essentially at home in Florida. In fact, Plaintiff's arguments regarding general jurisdiction in her Response seem to conflate general and specific personal jurisdiction considerations. *See* ECF No. [18] at 4 ("Under Florida's long-arm statute, a court can exercise general personal jurisdiction over a defendant that engages in 'substantial and not isolated activity' in Florida. Once

general personal jurisdiction is established, a Court must look at specific personal jurisdiction as set out in Florida's long-arm statute, Section 48.193." (citation omitted)). Upon review of the facts alleged in the Complaint, the Court concludes that Plaintiff has failed to satisfy her burden of establishing even an initial prima facie showing of general personal jurisdiction over Stands4. Accordingly, the Court finds that asserting general jurisdiction over Stands4 would not meet constitutional due process requirements.

### 2.  Specific Personal Jurisdiction

"[S]pecific personal jurisdiction authorizes jurisdiction over causes of action arising from or related to the defendant's actions within Florida and concerns a nonresident defendant's contacts with Florida only as those contacts related to the plaintiff's cause of action." *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1352 (citing *Oldfield*, 558 F.3d at 1220 n.27).

Here, Stands4 alleges that has no contacts with Florida and no presence in Florida sufficient to support specific jurisdiction. ECF No. [10] at 10. Rather, it "is an entity with principal address located in HaMerkaz, Israel," ECF No. [1] ¶ 14. Likewise, no representative of Stands4 has traveled to Florida, actively conducted business with anyone in Florida, or regularly communicated with anyone in Florida. ECF No. [10-1] ¶ 6. Moreover, Stands4 contends that Plaintiff has not alleged that it took any action in the State of Florida related to or giving rise to Plaintiff's claims, nor that Stands4 has purposefully availed itself of the privilege of conducting business in Florida as opposed to any other location in the world with access to the Internet. ECF No. [10] at 10. Thus, Stands4 argues that Plaintiff cannot establish the existence of specific personal jurisdiction here.

In arguing that specific personal jurisdiction over Stands4 exists in this case, Plaintiff relies on § 48.193(1)(a)1. and alleges that Stands4 "[o]perat[es], conduct[s], engag[es] in, or carr[ies] on a business or business venture in this state or ha[s] an office or agency in this state." Fla. Stat.

§ 48.193(1)(a)1. Plaintiff asserts that specific jurisdiction over Stands4 arises out of its contacts with Florida establishing a general course of business activity for pecuniary benefit. Specifically, Plaintiff notes that Stands4 does not deny that Florida is one of the principal sources of website visitors and advertisement revenues, yet it nonetheless disregards the online nature of the business by asserting its lack of contacts with the forum state. ECF No. [18] at 5; ECF No. [10-1] ¶¶ 5-6. Moreover, Plaintiff points out the contradictory allegations that Stands4 lacks any contacts with Florida, despite alleging that it serves "millions of unique visitors" through domain names such as "Grammar.com" and "Lyrics.com". ECF No. [10-1] ¶ 3. Critically, Plaintiff explains that, through Stands4's websites—including the Domain Name at issue here—it conducts substantial business in Florida by specifically targeting Florida residents with tailored, geo-targeted ads. *See* ECF No. [18-1] ¶¶ 7-8; ECF Nos. [18-3] & [18-4]. Similarly, Plaintiff explains that "Florida has been, and has consistently remained, one of the main sources of online traffic and website revenue for the calculator.com domain over the years, with substantial traffic continuing through the months leading to the unauthorized transfer." ECF No. [18] at 6; ECF No. [6] ¶ 8. Thus, Plaintiff argues that specific jurisdiction is satisfied because Stands4 has engaged in a general course of business activity in this State through the use and operation of the Domain Name for pecuniary benefit within Florida.

To establish specific jurisdiction based on allegations that a party is "operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state," Fla. Stat. § 48.193(1)(a)1, "[t]he business activity must demonstrate a general course of business for pecuniary benefit connected with the alleged tort." *Neelu Aviation, LLC v. Boca Aircraft Maint., LLC*, No. 18-cv-81445, 2019 WL 3532024, at *12 (S.D. Fla. Aug. 2, 2019) (citing *Sculptchair, Inc.*, 94 F.3d at 627). "For this provision to apply, there must be a direct affiliation,

nexus, or substantial connection between the basis for the cause of action and the business activity." *Borchers v. Amazon.com, Inc.*, No. 18-cv-61537, 2019 WL 5196117, at *3 (S.D. Fla. Jan. 30, 2019) (citing *Citicorp Ins. Brokers (Marine), Ltd. v. Charman*, 635 So. 2d 79, 82 (Fla. 1st DCA 1994)); *see also Neelu Aviation, LLC*, 2019 WL 3532024, at *12 ("The business activity must demonstrate a general course of business for pecuniary benefit connected with the alleged tort." (citing *Sculptchair, Inc.*, 94 F.3d at 627)). "The Court considers the quality, nature, and extent of the activity in the forum, and the foreseeability of consequences within the forum from outside the forum to determine if defendant purposefully availed himself of the protection and privileges of the forum state." *Connor v. Ferris Mktg., Inc.*, No. 2:16-cv-871-FtM-29MRM, 2017 WL 4341311, at *3 (M.D. Fla. Sept. 30, 2017) (citing *Sea Lift, Inc. v. Refinadora Costarricense de Petroleo, S.A.*, 792 F.2d 989, 993 (11th Cir. 1986)).

> Notably,
>
> a single transaction for profit can constitute engaging in a business venture. *See Labbee v. Harrington*, 913 So. 2d 679, 683 (Fla. 3d DCA 2005). . . . The intent of the long-arm statute is "to regard nonresidents who have availed themselves of the privilege of 'dealing in goods, services, or property, whether in a professional or nonprofessional capacity, within the State in anticipation of economic gain,' as operating a business or business venture." *Labbee*, 913 So. 2d at 683 (quoting *DeVaney v. Rumsch*, 228 So. 2d 904, 907 (Fla. 1969)).

*Stonepeak Partners, LP v. Tall Tower Capital, LLC*, 231 So. 3d 548, 556-57 (Fla. 2d DCA 2017).

Thus, a party can establish a general course of business activity in the forum state for pecuniary benefit "either by (1) 'doing a series of similar acts for the purpose of thereby realizing pecuniary benefit,' or (2) 'doing a single act for such purpose with the intention of thereby initiating a series of such acts.'" *Spigot, Inc. v. Hoggatt*, No. 2:18-cv-764-FtM-29NPM, 2020 WL 1955360, at *10 (M.D. Fla. Apr. 23, 2020) (quoting *Wm. E. Strasser Constr. Corp. v. Linn*, 97 So. 2d 458, 460 (Fla. 1957) (emphasis omitted)).

"Factors to consider in making this determination include: (1) the presence and operation of an office in Florida; (2) the possession and maintenance of a license to do business in Florida; (3) the number of Florida clients served; and (4) the percentage of overall revenue gleaned from Florida clients." *Stonepeak Partners, LP*, 231 So. 3d at 555 (quotation marks and citations omitted). "Another relevant factor is a defendant's marketing and advertising in Florida." *Dohler S.A. v. Guru*, No. 16-23137-CIV, 2017 WL 4621098, at *4 (S.D. Fla. Oct. 16, 2017) (citing *Carmel & Co. v. Silverfish, LLC*, No. 12-21328, 2013 WL 1177857, at *3 (S.D. Fla. Mar. 21, 2013)). Nevertheless, these factors are not dispositive. *See Louis v. Milton Transp., Inc.*, No. 2:20-cv-6-FtM-29NPM, 2020 WL 4057567, at *4 (M.D. Fla. July 20, 2020) (citing *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1167 (11th Cir. 2005)).

While Stands4 does not satisfy the physical contacts with Florida set forth in the first two factors, the absence of a physical presence in the forum state is not fatal to the Court's general course of business inquiry. *See Stonepeak Partners, LP*, 231 So. 3d at 556 ("a single transaction for profit can constitute engaging in a business venture" (citing *Labbee*, 913 So. 2d at 683)). Rather, Stands4's ongoing pattern of acts in Florida—i.e., by targeting Florida residents through location-specific advertising on its website and generating significant, continuous revenue from these Florida-tailored advertisements—is sufficient to establish a general course of business activity with this State. *See Spigot, Inc.*, 2020 WL 1955360, at *10; *see also* ECF Nos. [18-3] & [18-4]. Moreover, the record clearly supports the contention that, of the total users visiting Stands4's website, Florida residents frequent www.calculator.com more often than most other users around the world. ECF No. [18] at 6; ECF No. [6] ¶ 8. Thus, these frequent hits in Florida generate a significant amount of Stands4's sole source of revenue from the Domain Name through the advertising profits. *See F.A.C.E. Trading, Inc. v. Famiano*, No. 8:05-cv-1740-T-23TBM, 2006

WL 571723, at *5 (M.D. Fla. Mar. 8, 2006) (explaining that, even where "sales to Florida may have constituted a small percentage of [] total sales, [the infringing party's] activities in this state are sufficient to 'show a general course of business activity in the State for pecuniary benefit'" (citations omitted)); ECF Nos. [6-1] & [6-2]; *see also* ECF No. [5-1] at 2 (noting that, on average, Florida users account for 6.59% of the website's visitors).

Thus, despite the absence of an office in Florida or a license to do business in Florida, the evidence in the record establishes that Stands4 specifically targets Florida residents through its website advertisements, and it derives a portion of its revenue and a significant number of its users from Florida. The Court concludes that these continuous business connections in Florida are sufficient to establish that Stands4 is "operating, conducting, engaging in, or carrying on a business or business venture in this state," for the purposes of specific jurisdiction under Florida's long-arm statute. Fla. Stat. § 48.193(1)(a)1.; *see also Byoplanet Int'l, Inc. v. Vistek, Inc.*, No. 17-60044-CIV, 2017 WL 4737287, at *5 (S.D. Fla. Oct. 19, 2017) (concluding that the defendant's business transactions in Florida satisfied specific jurisdiction because they established ongoing business connections within the State). Further, the requisite nexus between Stands4's contacts with the forum state and the causes of action asserted in this case is clearly satisfied because Plaintiff's alleged injuries stem, in part, from her inability to operate, maintain, or develop the website, which is accessible in Florida, or to earn income from the ad revenue generated in this State. *See Neelu Aviation, LLC*, 2019 WL 3532024, at *12 ("The business activity must demonstrate a general course of business for pecuniary benefit connected with the alleged tort." (citing *Sculptchair, Inc.*, 94 F.3d at 627)).

As such, Plaintiff has established that specific personal jurisdiction exists over Stands4.

### 3.  Due Process Analysis

Having concluded specific jurisdiction pursuant to Florida's long-arm statute, the Court now addresses the Due Process inquiry under personal jurisdiction. "The Due Process Clause requires that the defendant have minimum contacts with the forum state so that the exercise of personal jurisdiction over the defendant does not offend traditional notions of fair play and substantial justice." *Peruyero v. Airbus S.A.S.*, 83 F. Supp. 3d 1283, 1287 (S.D. Fla. 2014) (citing *Melgarejo v. Pycsa Pan., S.A.*, 537 F. App'x 852, 858-59 (11th Cir. 2013)). "[D]ue process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1329 (Fed. Cir. 2008) (citing *Int'l Shoe Co.*, 326 U.S. at 316). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Id.* (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)).

"These principles are applied to different forms of personal jurisdiction, specific and general jurisdiction." *Roblor Mktg. Grp., Inc. v. GPS Indus., Inc.*, 645 F. Supp. 2d 1130, 1138 (S.D. Fla. 2009). "Where specific jurisdiction is asserted, the [Due Process] inquiry is 'whether: (1) the defendant purposefully directed its activities towards residents of the forum, (2) the claim arises out of or relates to those activities, and (3) assertion of personal jurisdiction is reasonable and fair.'" *Avocent Huntsville Corp.*, 552 F.3d at 1332.

Regarding Stands4's purposefully directed activities in Florida, as the Court discussed above, Stands4 lacks a physical presence in Florida, but operates the website often used by Florida

residents that generates income solely from advertisement revenue. Moreover, this ad revenue comes in part from advertisements that specifically target Florida users through location-specific ads. At the hearing and in the briefing, Stands4 argues that these ads are insufficient to establish the requisite purposeful activities directed to Florida. The Court disagrees. In one of the cases Stands4 relies upon, *Zamora Radio, LLC v. Last.fm LTD.*, the court expressly noted that national advertisements, instead of ones specifically targeted to the residents of Florida, would be insufficient to subject the defendant to personal jurisdiction in Florida. No. 09-20940-CIV, 2011 WL 2580401, at *6 (S.D. Fla. June 28, 2011) ("*Zamora I*"). As the court in *Zamora I* explained, "hyperlinks to *national, unaffiliated third-party websites* [are] insufficient to subject [the defendant] to personal jurisdiction in Florida . . . . because, without a more definitive showing, *these hyperlinks are not specifically directed to residents of Florida*." *Zamora I*, 2011 WL 2580401, at *6 (emphasis added). The court also went a step further and distinguished the non-location-specific nature of the ads in *Zamora I* from location-specific ads on a co-defendant's website that the court had examined earlier in the case. *Compare Zamora I*, 2011 WL 2580401, at *9 (explaining that, unlike the co-defendant's geo-targeted ads, "AccuRadio's website is not specifically directed at Florida consumers and local information about concert events is not provided on AccuRadio's website"), *with Zamora Radio, LLC v. Last.FM Ltd.*, No. 09-cv-20940, 2010 WL 11505226, at *8 (S.D. Fla. Jan. 27, 2010) ("*Zamora II*") ("Without prompting, the website provides concert listings in the State of Florida and in the Southern District. This highly interactive website is thus clearly targeted towards Florida residents."); *cf.* Roblor Mktg. Grp., Inc. v. GPS Indus., Inc., 645 F. Supp. 2d 1130, 1143 (S.D. Fla. 2009) (finding no personal jurisdiction where the defendant "has never targeted Florida residents through an advertising campaign"). Here, Stands4's geo-targeted ads—from which it derives all of its revenue for

www.calculator.com—are more akin to those in *Zamora II*, where the Court found that these specific efforts to target Florida residents favored exercising personal jurisdiction over the defendant.

In addition, the Court is unpersuaded by Stands4's argument that Google, and not Stands4, determines what ads to place on the website, and any contacts with Florida through these ads should be attributable only to Google. Moreover, Stands4's reliance on *Ash v. Royal Caribbean Cruises Ltd.* is entirely misplaced. 991 F. Supp. 2d 1214, 1217 (S.D. Fla. 2013). The defendant at issue in *Ash* did not operate its own website through which it sold cruise excursion tickets to Florida residents; rather, its co-defendant cruise ship operator, without any control or direction by the defendant, sold excursion tickets on its own Florida website to residents of the State. *Id. Ash* is distinguishable from the facts of the instant case, as Stands4 operates and manages its own website, places ads on this website—albeit through a third-party ad-placement program—and these ad placements, which geo-target users based on the volume of visitors from that state, then generate significant revenue for Stands4. Accordingly, the Court concludes that the facts establish purposefully directed activities toward residents in this State.

Next, the Court addresses whether the claims asserted in this case arise out of Stands4's forum-related activities. As discussed above, Plaintiff's claims arise from Stands4's allegedly wrongful use of the website accessible in Florida, its operation of the website for pecuniary benefit in part due to the activity of Florida users on the website, and its placement of geo-targeted ads directed toward Floridians in order to generate ad revenue. This establishes a nexus between Stands4's contacts with the forum state and the causes of action asserted because Plaintiff's alleged injuries stem, in part, from her inability to operate, maintain, or develop the website, which is accessible in Florida, or to earn income from the ad revenue generated in this State. *See Neelu*

*Aviation, LLC*, 2019 WL 3532024, at *12 ("The business activity must demonstrate a general course of business for pecuniary benefit connected with the alleged tort." (citing *Sculptchair, Inc.*, 94 F.3d at 627)). As such, the second prong of the Due Process inquiry is satisfied.

Finally, the Court must ensure that there are such minimum contacts that the exercise of jurisdiction over Stands4 would not offend traditional notions of reasonableness and fairness. "With respect to the last prong, the burden of proof is on the defendant, which must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable under the five-factor test articulated by the Supreme Court in *Burger King*." *Avocent Huntsville Corp.*, 552 F.3d at 1332 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). The five *Burger King Corp.* factors that this Court must weigh are: (1) "the burden on the defendant;" (2) "the forum State's interest in adjudicating the dispute;" (3) "the plaintiff's interest in obtaining convenient and effective relief;" (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and (5) the "shared interest of the several States in furthering fundamental substantive policies." *Burger King Corp.*, 471 U.S. at 477.

Although Stands4 states that because it is an Israeli company, the burden of litigating in Florida would be substantial, it provides no evidence or explanation as to why that burden rises to the level of offending Due Process, and mere inconvenience is insufficient for Stands4 to meet its burden here. *See Zamora II*, 2010 WL 11505226, at *9 ("Last.FM has produced no evidence to suggest that [litigating in this forum] would render jurisdiction unreasonable."). On the other hand, Plaintiff's interest in obtaining relief in her chosen forum merits some weight. Contrary to Stands4's position, the Court concludes that Florida does have an interest in adjudicating this dispute, because "in this case the alleged [trademark] infringement clearly also occurred in Florida by virtue of the website's accessibility in Florida." *Licciardello v. Lovelady*, 544 F.3d 1280, 1283

(11th Cir. 2008). Florida's interest in resolving this dispute is unaffected by the fact that other states may also have a similar interest in adjudicating the issues in this case. *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1358 (explaining that the fact that a plaintiff can litigate in other forums is inapposite because the defendant could "constitutionally be sued in Florida; that he could also be sued in New York is quite beside the point"). Finally, the judiciary "has an interest in efficiently resolving the dispute in the forum where an extensive record was established . . . ." *Id.*

## B.  Injunctive Relief

As noted previously, to obtain injunctive relief, a movant must satisfy four requirements: (1) "a substantial likelihood of success on the merits," (2) "that the preliminary injunction is necessary to prevent irreparable injury," (3) "that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant," and (4) "that the preliminary injunction would not be averse to the public interest." *Chavez*, 742 F.3d at 1271 (citing *Parker*, 275 F.3d at 1034-35). Ultimately, the decision of whether grant or deny injunctive relief "rests within the sound discretion of the district court." *ATP Sci. Proprietary, Ltd. v. Bacarella*, No. 20-cv-60827, 2020 WL 3868701, at *4 (S.D. Fla. July 9, 2020) (quoting *Transcon. Gas Pipe Line Co. v. 6.04 Acres, More or Less*, 910 F.3d 1130, 1163 (11th Cir. 2018)).

"To support a preliminary injunction, a district court need not find that the evidence positively guarantees a final verdict in plaintiff's favor." *Levi Strauss & Co.*, 51 F.3d at 985. "Rather, the court must determine whether the evidence establishes each of the four prerequisites." *Developers Sur. & Indem. Co. v. Bi-Tech Const., Inc.*, 964 F. Supp. 2d 1304, 1308-09 (S.D. Fla. 2013) (citing *Levi Strauss & Co.*, 51 F.3d at 985). In doing so, the "court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding." *Id.* "When

considering a motion for preliminary injunction, a district court may assess the relative strength and persuasiveness of the evidence presented by the parties, and is not required to resolve factual disputes in favor of the non-moving party." *Rensel v. Centra Tech, Inc.*, No. 17-24500-CIV, 2018 WL 4410126, at *3 (S.D. Fla. June 25, 2018) (citing *Imaging Bus. Machs., LLC. v. BancTec, Inc.*, 459 F.3d 1186, 1192 (11th Cir. 2006)), *report and recommendation adopted*, No. 17-24500-CIV, 2018 WL 4828444 (S.D. Fla. Sept. 25, 2018).

With regard to the first requirement for injunctive relief, "[a] substantial likelihood of success on the merits requires a showing of only *likely* or probable, rather than *certain*, success." *Schiavo ex rel. Schindler*, 403 F.3d at 1232 (emphasis in original) (citing *Home Oil Co. v. Sam's E., Inc.*, 199 F. Supp. 2d 1236, 1249 (M.D. Ala. 2002)). "Where the 'balance of the equities weighs heavily in favor of granting the [injunction],' the movant need only show a 'substantial case on the merits.'" *Garcia-Mir*, 781 F.2d at 1453 (citing *Ruiz*, 650 F.2d at 565).

Here, Stands4 argues that Plaintiff's claims necessarily will fail because it purchased the Domain Name in good faith as a bona fide purchaser after conducting significant due diligence to ensure that the sale was legitimate. Thus, as it contends, Plaintiff's claims regarding Stands4's bad faith intent to traffic in the stolen Domain Name for profit are defeated.

"On a motion for preliminary injunction, plaintiffs must demonstrate a likelihood of success on the merits at trial as to asserted affirmative defenses, as well as to the elements of Plaintiffs' prima facie case." *Canal Authority*, 489 F.2d 567; *see also Lucky Cousins Trucking, Inc. v. QC Energy Res. Tex., LLC*, 223 F. Supp. 3d 1221, 1225 (M.D. Fla. 2016); *TracFone Wireless, Inc. v. Clear Choice Connections, Inc.*, 102 F. Supp. 3d 1321, 1325 (S.D. Fla. 2015) ("To establish a substantial likelihood of success on the merits, a plaintiff must demonstrate a likelihood of success at trial as to both its *prima facie* case and the affirmative defenses asserted

by the defendant." (citing *Original Appalachian Artworks, Inc. v. Topps Chewing Gum, Inc.*, 642 F. Supp. 1031, 1034 (N.D. Ga. 1986); *Metro-Goldwyn-Mayer, Inc. (MGM) v. Showcase Atl. Cooperative Prods., Inc.*, 479 F. Supp. 351, 355 (N.D. Ga. 1979))).

In its Motion, Stands4 alleges, in relevant part, that it conducted extensive due diligence before purchasing the Domain Name to verify that it was legitimately for sale by the lawful owner. Likewise, Stands4 explains that, in addition to its own investigation, it also sought the opinion and services of a professional domain name consultant regarding the propriety of the sale, and further verified proper ownership and authorization to transfer the Domain Name with the domain name sales platform, Dan.com, before purchasing the Domain Name. ECF No. [19-1] at 1-2. In addition, after the sale of the Domain Name was finalized, Stands4 confirmed the validity of the sale with GoDaddy.com. *Id.* All of the efforts Stands4 undertook to affirm the legitimacy of the sale confirmed that the sale was valid. *Id.* Stands4 contends that these efforts establish its status as a good faith, bona fide purchaser, thus defeating Plaintiff's claims of theft in bad faith pursuant to the ACPA's safe-harbor provision, § 1125(d)(1)(B)(ii).

Despite Stands4's arguments regarding its status as a bona fide purchaser, Plaintiff notes that Stands4 is now on notice that its continued use and operation of the Domain Name constitutes trafficking in violation of trademark law and the ACPA. Likewise, the evidence submitted in support of the TRO Motion demonstrates that Plaintiff's Domain Name was hijacked through the use of fraudulent identification documents purporting to be Plaintiff to obtain access to Plaintiff's registrar account in order to transfer the Domain Name. Plaintiff alleges that these fraudulent acts, which were ultimately successful, were committed in bad faith for the purpose of profiting from the use and quick sale of Plaintiff's valuable mark. Plaintiff also alleges that Stands4 purchased the Domain Name in bad faith because reasonable diligence would have alerted it to the fraudulent

sale. Plaintiff asserts that, since the fraudulent transfer, Stands4 now uses and operates the

www.calculator.com website for its own pecuniary gain.

      Plaintiff's TRO Motion relied on her claim arising under § 1125(d) of the ACPA.

        The Anticybersquatting Consumer Protection Act ("ACPA") protects the
owner of a distinctive or famous trademark from another's bad faith intent to profit
from the trademark owner's mark by registering or using a domain name which is
identical or confusingly similar to, or dilutive of, the trademark owner's mark
without regard to the goods or services of the parties. *See* 15 U.S.C. § 1125(d). To
prevail under the ACPA, a plaintiff must prove: "(1) its mark is distinctive or
famous and entitled to protection; (2) the defendant's domain name is identical or
confusingly similar to the plaintiff's mark; and (3) the defendant registered or used
the domain name with a bad faith intent to profit." *Bavaro Palace, S.A. v. Vacation
Tours, Inc.*, 203 F. App'x 252, 256 (11th Cir. 2006) (citing *Shields v. Zuccarini*,
254 F.3d 476, 482 (3d Cir. 2001)).

*Chanel, Inc. v. Luxurybagonineshop.com*, No. 13-24016-CIV, 2013 WL 12064875, at *4 (S.D.

Fla. Nov. 21, 2013).

      To determine whether a person has bad faith intent for the purposes of the ACPA,

§ 1125(d)(1)(B) lists nine non-exhaustive factors for courts to consider.[3] "Ultimately, each of these

---

[3] The nine bad-faith factors are the following:

      (B)(i) In determining whether a person has a bad faith intent described under
subparagraph (A), a court may consider factors such as, but not limited to—
      (I) the trademark or other intellectual property rights of the person, if any, in the
domain name;
      (II) the extent to which the domain name consists of the legal name of the person
or a name that is otherwise commonly used to identify that person;
      (III) the person's prior use, if any, of the domain name in connection with the bona
fide offering of any goods or services;
      (IV) the person's bona fide noncommercial or fair use of the mark in a site
accessible under the domain name;
      (V) the person's intent to divert consumers from the mark owner's online location
to a site accessible under the domain name that could harm the goodwill represented by the
mark, either for commercial gain or with the intent to tarnish or disparage the mark, by
creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement
of the site;
      (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the
mark owner or any third party for financial gain without having used, or having an intent
to use, the domain name in the bona fide offering of any goods or services, or the person's
prior conduct indicating a pattern of such conduct;

factors address whether 'the defendant's use of the disputed domain name is legitimate—i.e., for some purpose other than simply to profit from the value of the trademark.'" *Heron Dev. Corp. v. Vacation Tours, Inc.*, No. 16-cv-20683, 2017 WL 2895921, at *15-16 (S.D. Fla. Apr. 13, 2017) (citations omitted) (quoting *Ford Motor Co. v. Greatdomains.Com, Inc.*, 177 F. Supp. 2d 635, 642 (E.D. Mich. 2001)), *report and recommendation adopted*, No. 16-20683-CIV, 2017 WL 2901203 (S.D. Fla. May 26, 2017). "A court's analysis of whether a defendant had the bad faith intent to profit necessary to a cybersquatting claim is not based on a score card of the statutory factors. As [the Eleventh Circuit has] explained, the factors are permissive considerations," and must be assessed on a case-by-case basis. *S. Grouts & Mortars, Inc. v. 3M Co.*, 575 F.3d 1235, 1249 (11th Cir. 2009) (citing *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 269 (4th Cir. 2001); *Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489, 498 (2d Cir. 2000)).

Stands4 does not dispute Plaintiff's assertion that the first two elements of § 1125(d)—namely, that Plaintiff's mark is distinctive or famous and entitled to protection and that Stands4's Domain Name is identical or confusingly similar to Plaintiff's mark—are satisfied. Instead, Stands4 challenges the existence of the third element—that Stands4 registered or used the domain

---

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).

(ii) Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful.

15 U.S.C. § 1125(d)(1)(B).

name with a bad faith intent to profit from it—because it contends that it purchased the Domain Name as a bona fide purchaser through a valid sale after conducting extensive due diligence as to the sale's legitimacy. Thus, Stands4 asserts that Plaintiff cannot show a substantial likelihood of success on the merits on her ACPA claim.

As an initial matter, the Court agrees with Plaintiff that Stands4's continuing use of the Domain Name from the time it learned of the dispute until the entry of the TRO is noteworthy for the purposes of establishing a likelihood of success on Plaintiff's ACPA claim. "[A] bad faith intent to profit from a domain name can arise either at the time of registration or at any time afterwards." *Sound Surgical Techs., LLC v. Leonard A. Rubinstein, M.D., P.A.*, 734 F. Supp. 2d 1262, 1277 (M.D. Fla. 2010); *see also Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 385 (2d Cir. 2003) ("If another party has trademark rights in a mark that is similar to the domain name, the domain-name registrant must use the name without a 'bad faith intent to profit,' § 1125(d)(1)(A)(i), to maintain its registration rights."). Thus, regardless of whether it intended to traffic in the Domain Name immediately after the sale, upon Stands4's notification by Plaintiff that it was trafficking in Plaintiff's stolen Domain Name and mark, its alleged continued operation and use of the website constitutes bad faith intent to profit. *See Sound Surgical Techs., LLC*, 734 F. Supp. 2d at 1277 (noting that refusal to stop using marks without consent upon proper notice of trafficking in order to continue to profiting was sufficient to establish the bad faith intent factor); *Nicopure Labs, LLC v. Doe*, No. 8:19-cv-1354-33AAS, 2019 WL 7423535, at *3 (M.D. Fla. Aug. 20, 2019) (same), *report and recommendation adopted*, No. 8:19-cv-1354-T-33AAS, 2019 WL 7423528 (M.D. Fla. Sept. 9, 2019); *Heron Dev. Corp.*, 2017 WL 2895921, at *14 ("Moreover, Defendants continue to "use" the domains with active websites as of the date of this filing.").

Further, "[b]ecause defendants easily can conjure up a "legitimate" use for a domain name that incorporates a trademark, plaintiffs frequently will find it difficult, if not impossible, to obtain evidence probative of 'bad faith intent' without court sanctioned discovery." *Ford Motor Co.*, 177 F. Supp. 2d at 643. "Indeed, obtaining information relevant to almost all of the bad faith factors set forth in the statute requires direct testimony from the defendant." *Id.* "Accordingly, the court concludes that, at least where facts showing a prima facie case of "intent to profit" have been alleged, the element of bad faith generally will not come into play until the summary judgment stage." *Id.*; *Sound Surgical Techs., LLC*, 734 F. Supp. 2d at 1276 ("Although discovery may uncover additional evidence relevant to some of the factors, the evidence before the Court tends to show that Defendants have used or trafficked in the domain names with a bad faith intent to profit."). Upon consideration of the nine statutory factors and the entire record in this case, the Court concludes that the evidence Plaintiff submitted in support of her TRO Motion establishes a prima facie case of Stands4's bad faith intent to profit from Plaintiff's trademark and Domain Name. *See Direct Niche, LLC v. Via Varejo S/A*, No. 15-cv-62344, 2017 WL 5952896, at *9 (S.D. Fla. Aug. 10, 2017) (finding bad faith intent where the plaintiff purchased high-value domains to generate revenue from the goodwill associated with a similar, widely-known mark), *aff'd*, 898 F.3d 1144 (11th Cir. 2018).

However, Stands4 contends that it is protected under the safe-harbor provision of the ACPA because it was a bona fide purchaser of the Domain Name. In addition to submitting two declarations from Stands4's CEO to support its good faith purchase, it also submitted the declaration of its domain name consultant who was engaged to verify the legitimacy of the sale. ECF Nos. [10-1], [19-1], & [19-2]. Notably absent from these declarations, however, are documents or evidence to establish the identity or personal information of the alleged seller, the e-

mail used in negotiating the sale, or any other documents verifying Stands4's statement that it properly purchased the Domain Name from Plaintiff herself.

Moreover, under the safe-harbor provision of the ACPA, "[b]ad faith intent . . . shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1221 (11th Cir. 2012) (quoting 15 U.S.C. § 1125(d)(1)(B)(ii)). "To qualify for that safe-harbor, [Stands4] must have had both a subjective belief and an objectively reasonable belief in the lawfulness of its actions." *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1226 (11th Cir. 2012). However,

> "[C]ourts should 'make use of this . . . defense very sparingly and only in the most unusual cases.'" *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190, 1203 (9th Cir. 2009) (quoting *Audi AG v. D'Amato*, 469 F.3d 534, 549 (6th Cir. 2006)). "Otherwise, the defense would 'undermine the rest of the statute' because '[a]ll but the most blatant cybersquatters will be able to put forth at least some lawful motives for their behavior.'" *Id.* (quoting *Virtual Works*, 238 F.3d at 270).

*Direct Niche, LLC*, 2017 WL 5952896, at *10.

In light of the large amount of evidence Plaintiff submitted demonstrating that her personal identifying information previously been used in a similar hijacking, without more evidence from Stands4 showing communications or negotiations between the parties, documents verifying the seller's identity, etc., to demonstrate the legitimate basis for the sale, the Court cannot find that Stands4 had an objectively reasonable belief that the transaction was legitimate and lawful. As such, based on the procedural posture of this case and the current record before the Court, Plaintiff has sufficiently demonstrated a likelihood of success on the merits of her ACPA claim.

Turning to the irreparable injury requirement, Stands4 primarily argues that Plaintiff has failed to establish the type of irreparable harm necessary to warrant injunctive relief because her alleged injuries are solely monetary and thus are not properly the subject of a TRO. The Court

finds this argument unavailing, given the documents Plaintiff submitted in support of her TRO Motion. "To demonstrate irreparable harm, a movant must show 'that the injury cannot be undone through monetary remedies.'" *Gayle v. Meade*, No. 20-21553-CIV, 2020 WL 3041326, at *20 (S.D. Fla. June 6, 2020) (quoting *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1223 (S.D. Fla. 2014)). Plaintiff's TRO Motion and accompanying exhibits in support clearly set forth ongoing injuries beyond monetary losses. Among other things, Plaintiff's TRO Motion details the loss of goodwill and the risk of customer confusion from Stands4's alleged trafficking in the Domain Name. Likewise, Plaintiff states that since the alleged theft and subsequent transfer, the Domain Name has dropped in search engine rankings. Such declining rankings not only affect the overall activity on the Domain Name website, thus decreasing the revenues generated, but they also cannot be restored through traditional monetary remedies like lost profits can be. Plaintiff has also adequately demonstrated that these injuries are ongoing, not speculative. Thus, the Court finds Stands4's argument regarding the lack of irreparable harm to be without merit.

Additionally, although it is likely that the monetary harm Stands4 will suffer pursuant to the TRO is significant, the Court gives more weight to the evidence Plaintiff submitted demonstrating the ongoing, irreparable injuries she is suffering due to the alleged theft of the Domain Name. This is especially proper given the absence of any evidence from Stands4 substantiating the expenditures it made to improve the website or establishing that its operation of the Domain Name has increased its value. In fact, the only cognizable harm Stands4 seemingly stands to suffer by maintaining the TRO are financial losses while the injunction is in place, which is not sufficient to outweigh the significant and ongoing monetary and non-monetary injuries Plaintiff has sustained—and continues to sustain—due to the allegedly fraudulent transfer.

Finally, "public policy considerations mandate the requested relief. In a trademark or service mark infringement case, a third party, the consuming public, is present and its interests are paramount." *Campero USA Corp. v. PCNY, LLC*, No. 11-21094-CIV, 2011 WL 13319576, at *8 (S.D. Fla. Sept. 8, 2011) (citing *Davidoff & Cie. S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001) (preliminary injunction "is not adverse to the public interest, because the public interest is served by preventing consumer confusion in the marketplace.")). "[W]hen a trademark is said to have been infringed, what is actually infringed is the right of the public to be free of confusion and the synonymous right of the trademark owner to control his products' reputation." *Sundor Brands, Inc. v. Borden, Inc.*, 653 F. Supp. 86, 93 (M.D. Fla. 1986); *see also Interim Healthcare, Inc. v. Interim Healthcare of Se. La., Inc.*, No. 19-cv-62412, 2020 WL 3078531, at *19 (S.D. Fla. June 10, 2020). Therefore, the TRO in this case was not averse to the public interest. *See PayCargo, LLC v. CargoSprint LLC*, No. 19-cv-22995, 2020 WL 3315905, at *7 (S.D. Fla. May 14, 2020) (recognizing that when a trademark is shown to have been infringed, the public's right to be free of confusion between two marks is infringed too (citing *Sundor Brands, Inc.*, 653 F. Supp. at 93)).

As such, the Court concludes that Plaintiff has satisfied all four requirements for the issuance of the Court's Temporary Restraining Order, ECF No. [8]. Based on this conclusion, Stands4's Motion is denied.

## IV.  CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.  Stands4's Motion, **ECF No. [10]**, is **DENIED**.

2.  The currently scheduled hearing on Plaintiff's Motion for Preliminary Injunction, ECF No. [5], shall remain scheduled for August 7, 2020, at 1:30 p.m., as set forth in the Court's previous TRO Order, ECF No. [8].

3.  Plaintiff is ordered to serve a copy of this Order on all Defendants in this case **within forty-eight (48) hours** of the entry of this Order and she must promptly file a notice of compliance before the Court thereafter.

**DONE AND ORDERED** in Chambers at Miami, Florida, on August 3, 2020.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record